923 F.2d 810
 STINSON, LYONS, GERLIN & BUSTAMANTE, P.A., a Florida
Professional Association, Plaintiff-Appellant,
v.
BRICKELL BUILDING 1 HOLDING COMPANY, INC., a Delaware
Corporation, and Brickell Building 2 Holding
Company, a Delaware Corporation,
Defendants-Appellees,
Morgan Guarantee Trust Company of New York, a New York
Corporation, as Trustee, Defendants.
 No. 90-5873.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 8, 1991.
 
 Mark D. Greenberg, Stinson, Lyons, Gerlin & Bustamante, Charles C. Kline, Miami, Fla., for plaintiff-appellant.
 Alvin B. Davis, Steel, Hector & Davis, Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before JOHNSON and BIRCH, Circuit Judges, and MERHIGE*, Senior District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This case arises on an expedited appeal of the district court's finding that the plaintiff Stinson, Lyons, Gerlin & Bustamante ("the Tenant") had not been constructively evicted from its leasehold by its landlord.
 
 I. STATEMENT OF THE CASE
 A. Background Facts
 
 2
 The Tenant is a general practice law firm with sixteen attorneys and approximately fifty-five total employees. Its offices are located in a fourteen-story professional office tower at 1401 Brickell Avenue in Miami, Florida. In March of 1973, the tenant entered into the Lease at issue for a period of ten years. The Lease granted the Tenant two successive five-year options to renew. On June 1, 1988, the Tenant exercised its final option, renewing the Lease until May 31, 1993. At the time the Tenant exercised this option, it had leased all of the ninth floor and part of the eighth floor.[1]
 
 
 3
 When the Lease was originally negotiated, the building provided its tenants with first-class amenities in a prestigious location. In the ensuing eighteen years, however, the building and its support systems gradually deteriorated. Because of advances in technology and revisions in the applicable codes, the building did not contain the state-of-the-art health, safety, and amenity features offered by newer buildings in the area. The Landlord found itself losing tenants to competitors. At the time of the trial, the building contained only four tenants and only twenty percent of its space was occupied. Faced with this situation, the Landlord decided to renovate the building and upgrade both its appearance and its mechanical systems in an effort to attract additional tenants.
 
 
 4
 In late March or early April of 1989, the Landlord informed the Tenant of its renovation plan. The following renovations and repairs had the greatest impact on the Tenant's demised premises:[2] (1) installation of a fire sprinkler system on each floor, except the Tenant's, and pressurization of the fire stairs; (2) removal of asbestos on each floor, except the Tenant's; (3) replacement of the existing plaza; (4) enclosure of a walkway connecting the building to the garage; (5) replacement of the exterior curtain wall with a new curtain wall; (6) replacement of the air-conditioning cooling towers and chillers; and (7) installation of high pressure air-conditioning ducts on each floor, except the Tenant's.[3]
 
 
 5
 Without question the most controversial renovation was the Landlord's plan to replace the existing pre-cast concrete exterior curtain walls and windows with new curtain walls and windows. This replacement necessitated exposing the Tenant's exterior offices to the open environment. According to the plan, each wall was to be replaced over a single week-end. The removal of the pre-cast concrete panels would require the removal of two feet of the Tenant's ceiling at the perimeter of the building. All partition walls separating the Tenant's offices were to be cut back either one or two feet from the perimeter as well. The carpet in each perimeter office was to be rolled back at least two feet. At least four feet of clear working space was to be needed in each office, necessitating the removal or relocation of the Tenant's furniture and files in order to accomplish the wall replacement. The Tenant's walls and ceilings were to be restored no later than the conclusion of the following weekend. The offices were to be fully useable, however, during the intervening week.
 
 
 6
 The Landlord proposed various options to accommodate the Tenant during the renovation including: (1) building out renovated space above the Tenant's floors and moving the Tenant to that new space, all at the Landlord's expense, with the Tenant free to depart at the end of the lease term or to negotiate a new lease; (2) paying the Tenant's moving expenses to a comparable office building nearby and paying any rental increase for the duration of the Tenant's lease term;[4] or, (3) allowing the Tenant to terminate the Lease with a cash payment from the Landlord of $350,000. The Tenant rejected all of these options and decided to move into a new building on its own by December 1, 1990.[5]
 
 B. Procedural History
 
 7
 On October 30, 1989, the Tenant filed a complaint alleging that the Landlord was constructively evicting the Tenant from its leasehold by the Landlord's renovation of the building. The Tenant sought to enjoin the renovation until December 1, 1990, when it was to have occupied its new offices. It also sought to recover damages of $1,575,000 for the market value of its remaining leasehold interest from December 1, 1990 through May 31, 1993, the value of its leasehold improvements, the cost of having to prematurely move and purchase new improvements, and the cost of lost profits to its law practice.[6]
 
 
 8
 The district court held a bench trial from August 6 through August 14, 1990. The district court found that the lease authorized the Landlord to undertake the challenged renovations without liability to the Tenant and that there was no support for the Tenant's claim for constructive eviction. Accordingly, it entered judgment on October 1, 1990, in favor of the Landlord. The district court, however, found that, although the intrusion into the Tenant's space as a result of the removal of the exterior curtain wall could not be avoided, redress was required. Accordingly, the court awarded a twenty percent reduction in rent during the weeks necessary for the installation of the curtain wall. 747 F.Supp. 1470.
 
 
 9
 The following issues are raised in this appeal: (1) whether the lease authorized the Landlord to undertake the challenged renovations and repairs without liability to the Tenant; (2) whether the Landlord has constructively evicted the Tenant from the premises; and (3) whether the district court erred in refusing to admit additional testimonial and videotape evidence after the close of evidence.
 
 II. ANALYSIS
 
 10
 Interpretation of a lease contract is a question of law subject to de novo review on appeal. Gibbs v. Air Canada, 810 F.2d 1529, 1532 (11th Cir.1987). A district court's findings of fact will not be reversed unless clearly erroneous. Centel Cable Television Co. of Fla. v. Thos. J. White Development Corp., 902 F.2d 905, 908 (11th Cir.1990).
 
 A. Authorization for the Renovations
 
 11
 Under Florida law, every contract provision should be given meaning and effect. Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So.2d 938, 941 (Fla.1979). The intentions of the parties in entering the lease should be gleaned from the unambiguous terms of the agreement itself. The lease represents the deliberate distribution of risks and benefits by the parties. See Meyer v. Caribbean Interiors, Inc., 435 So.2d 936, 938 (Fla.Dist.Ct.App.1983). Florida law also recognizes that "in the absence of express covenants inconsistent therewith" the ordinary lease includes an implied covenant of quiet enjoyment. See Hankins v. Smith, 103 Fla. 892, 138 So. 494, 496 (1931).
 
 
 12
 The district court found that three provisions in the lease specifically authorized the renovations planned by the Landlord.[7] The district court expressly found that the Landlord had not engaged in the renovation with any intent to evict the Tenant, but had intended only to restore the property to a condition that would enable the Landlord to compete with comparable professional office buildings. It recognized the existence of an implied covenant of quiet enjoyment in favor of the Tenant. The court found, however, that the three express provisions of the Lease were inconsistent with the implied covenant of quiet enjoyment and that Florida law required the court to give effect to both. Thus, the court found that the Landlord had a right to renovate the building subject to the duty to do so reasonably and responsibly.
 
 
 13
 The Tenant claims the court misinterpreted the lease provisions to authorize the renovations in violation of the covenant of quiet enjoyment. Paragraph thirteen of the Lease authorized the defendant to make improvements to the building without liability to the Tenant. The Tenant does not dispute that the renovations are properly classified as improvements. The Tenant claims, however, that this provision authorized the Landlord only to make improvements which were outside the demised space. More specifically, the Tenant claims that, if paragraph thirteen is interpreted to authorize entry into its premises to replace the curtain wall, this would render paragraph twenty-four meaningless. According to the Tenant, paragraph twenty-four has meaning and effect only if paragraph thirteen is read to authorize only those improvements to the building that do not require entry into the Tenant's demised premises. The Landlord may, under this interpretation, enter the Tenant's premises only to make improvements that fall within the categories of paragraph twenty-four, e.g., those "deemed necessary for the safety, comfort of the occupants thereof, or preservation of said premises or of said building." The Tenant claims that the removal of the exterior walls, which required that the Landlord enter its premises, does not fall within these categories.
 
 
 14
 Paragraph thirteen itself contains no such words of limitation as the Tenant would read into it. The renovations fall precisely within the language of this paragraph. They are improvements, additions and alterations "to the building of which the demised space is a part." Moreover, paragraph twenty-four provides that the Landlord "shall have the right to enter to make repairs, additions or alterations as may be deemed necessary for the safety, comfort of the occupants, or preservation of the building." This paragraph allocates to the Landlord the decision as to what type of additions, alterations or repairs are necessary. The evidence supports the district court's finding that major repairs or renovations of the pre-cast walls would be necessary in the near future. The Landlord determined that replacement of the curtain was the necessary repair or alteration. The Landlord was exercising only the rights it had reserved under the Lease. We therefore concur with the district court that the Lease authorized the Landlord to undertake all of the renovations challenged herein.
 
 
 15
 As the district court noted, the Florida Supreme Court in Hankins, 138 So. at 496, discussed the implied right of quiet enjoyment in terms of the absence of inconsistent express covenants. Given the presence of the express lease provisions which are inconsistent with the implied covenant of quiet enjoyment, the district court did not err by giving effect to both the express and the implied covenants. See Hankins, 138 So. at 496; see also Hardwick, Cook & Co. v. 3379 Peachtree, Ltd., 184 Ga.App. 822, 363 S.E.2d 31, 34 (1987) (holding renovations contractually authorized by a lease are not inconsistent with an implied covenant of quiet enjoyment); Bijan Designer for Men, Inc. v. St. Regis Corp., 142 Misc.2d 175, 536 N.Y.S.2d 951, aff'd, 150 A.D.2d 244, 543 N.Y.S.2d 296 (1989).
 
 
 16
 Moreover, the evidence supports the district court's findings that the Landlord has acted reasonably and responsibly in exercising its right to renovate. The Landlord gave the Tenant the option of moving into newly renovated premises within the building constructed to meet the Tenant's needs, paying the Tenant's moving expenses to a comparable building nearby and paying the difference in rental costs for the duration of the Lease, or terminating the Lease and receiving a cash settlement totaling $350,000. The Tenant declined all three options and sought new premises on its own.
 
 B. Constructive Eviction
 
 17
 The district court held that the Tenant failed to prove constructive eviction. The Tenant argues, however, that because of their scope and intrusiveness, the renovations rise to the level of a constructive eviction as a matter of law.
 
 
 18
 In Hankins, 138 So. at 496, the Florida Supreme Court defined a constructive eviction as a wrongful act by the landlord which, though not amounting to an actual eviction, is done with the express or implied intention of interfering with the tenant's beneficial enjoyment of the leased property. For the landlord to be liable for the act allegedly causing the constructive eviction, the act must be "wrongful, unwarranted, or unlawful." Sentry Water Systems, Inc. v. Adca Corp., 355 So.2d 1255, 1257 (Fla.Dist.Ct.App.1978); accord McCready v. Booth, 398 So.2d 1000, 1001 (Fla.Dist.Ct.App.1981). To establish a claim for constructive eviction, Florida law generally requires a tenant to abandon the premises within a reasonable time after the landlord's wrongful act. Richards v. Dodge, 150 So.2d 477, 481 (Fla.Dist.Ct.App.1963). Whether constructive eviction has occurred is a question of fact. Sentry, 355 So.2d at 480.
 
 
 19
 In the instant case, the Landlord has committed no wrongful act. The Lease authorizes the renovations, and the district court specifically found that the Landlord undertook the renovations for economic reasons and not to evict the Tenant. Moreover, the Tenant has continued to occupy the premises despite the renovations which have occurred to this point. The Tenant also testified that it had been able to operate its law firm at more than ninety percent capacity. Accordingly, the district court's finding that there was no constructive eviction is not clearly erroneous. See Hardwick, 363 S.E.2d at 34 (holding that renovations contractually authorized by the lease do not amount to a constructive eviction).
 
 C. Admission of Evidence
 
 20
 Although this is a diversity case in which Florida provides the substantive law, the admissibility of evidence in federal court remains a matter of federal law. See Borden, Inc. v. Florida E. Coast Ry. Co., 772 F.2d 750, 754 (11th Cir.1985). It is a decision left to the discretion of the trial court and will not be reversed absent a clear finding of abuse of discretion. Feazell v. Tropicana Prods., Inc., 819 F.2d 1036, 1040 (11th Cir.1987).
 
 
 21
 Although the trial concluded on August 14, 1990, the Tenant, on September 6, 1990, moved to supplement the record with a six-and-one-half-minute videotape of the removal of the exterior skin of the building along with testimony regarding the impact of the removal on the Tenant. The court's extensive discussion of the removal of the exterior skin in its opinion reveals that it was fully aware of the effect of the removal on the Tenant. Accordingly, the district court did not abuse its discretion when it denied the motion to supplement the record.
 
 III. CONCLUSION
 
 22
 Upon close scrutiny of the record, we are left with the impression that the Tenant, by this litigation, is attempting to take advantage of the Landlord's economic need to renovate its building in order to obtain premises superior to those it currently enjoys.[8] Apparently dissatisfied with the options offered to it by the Landlord, the Tenant chose to litigate in hopes of securing a better deal. Commercial tenants are frequently confronted with their landlord's need to renovate the property of which the demised premises are a part in order to maintain its economic viability. Such tenants cannot expect to hold hostage contractually authorized renovations as a means of securing superior premises.
 
 
 23
 In closing, we concur with the district court that the Lease authorizes all the work covered by the renovations and that the Landlord has done its best to minimize the noise, inconvenience, and disruption to the Tenant's law business. Accordingly, this Court AFFIRMS the decision of the district court.
 
 
 
 *
 Honorable Robert R. Merhige, Jr., Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The Tenant located its offices entirely on the ninth floor. The Tenant sublet the space on the eighth and ninth floors that it did not occupy
 
 
 [2]
 The renovations also included gutting and renovating each floor, other than the Tenant's. The Landlord also planned to renovate the elevators, reconstruct and expand the penthouse floors, and pour new footings for the building. It is undisputed that the renovations planned will result in the virtual reconstruction of the building from its skeleton
 
 
 [3]
 To accommodate the Tenant, the Landlord agreed to forgo installing fire sprinklers and air conditioning ducts and removing asbestos from the Tenant's floor
 
 
 [4]
 The Landlord provided the Tenant with a list of five buildings from which to select new office space
 
 
 [5]
 At oral argument on December 19, 1990, however, the Tenant informed the Court that it continued to occupy the premises at issue in this litigation
 
 
 [6]
 The district court permitted the parties to present evidence on lost profits even though this was not designated as an item of damages in the pretrial stipulation. The Tenant sought damages for the lost profits for itself and on behalf of its three law-firm subtenants in the amounts of $561,000, $35,000, $60,000, and $38,000, respectively
 
 
 [7]
 These Lease provisions are as follows:
 
 
 [13]
 Landlord shall have the right to make or build additions, alterations, or improvements to the building of which the demised space is a part as landlord deems advisable without liability to the Tenant
 
 
 [14]
 [If the] demised premises are damaged by fire or otherwise ... [n]o claim or compensation shall be made by reason of loss, damage, inconvenience or annoyance arising from the necessity of repairing any portion of said building, or its plan or appurtenances, however such necessity may occur
 
 
 [24]
 Landlord, or any of its agents, shall have the right to enter said premises during all reasonable hours to examine the same or to make such repairs, additions, or alterations as may be deemed necessary for the safety, comfort of occupants thereof, or preservation of said premises or of said building
 
 
 [8]
 As an item of damages, the Tenant sought payment from the Landlord for the difference in rent between its current premises and its proposed premises which are located in a recently constructed office building with state of the art facilities and mechanical systems